# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**VENEZIA AMOS, LLC**
  **a Georgia Limited Liability Company,**

                    **Plaintiff,**

**v.**                                                    **Case No. 3:07cv146/MCR**

**BENARD FAVRET**
  **a/k/a BERNARD FAVRET, and**
**F & F DEVELOPERS, LLC,**
  **a Louisiana Limited Liability Company,**

                    **Defendants.**
_____/

# O R D E R

        Plaintiff Venezia Amos, LLC, ("plaintiff" or "Venezia Amos") sues defendants F & F Developers, LLC, ("F & F") and Benard Favret (a/k/a Bernard Favret) ("Favret") asserting various claims arising from plaintiff's purchase of a membership interest in F & F. Defendants have filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction and pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim.[1] Plaintiff filed a response to the motion, to which defendants have replied.[2]  The court held an evidentiary hearing on defendants' Rule 12(b)(2) motion to resolve issues of disputed fact raised by the parties' affidavits.  After considering the arguments of counsel, the evidence presented by the parties, and the relevant case law, the court DENIES defendants' motion to dismiss for lack of personal jurisdiction.  Additionally, the court GRANTS defendants' motion to dismiss for failure to state a claim upon which relief can be granted.  Dismissal is without prejudice to plaintiff's filing an amended complaint.

_____

        [1]  Doc. 10; affidavit at doc. 16.

        [2]  Respectively, docs. 21 and  28.

Case No. 3:07cv146/MCR

## BACKGROUND

The following facts are taken from the complaint, including attachments, and the testimony and exhibits presented during the evidentiary hearing.[3]  Unless otherwise noted, the material facts recited are undisputed.

Tripp Amos ("Amos") is a Georgia resident who, along with his father, owns Venezia Amos, a Georgia limited liability company.  Favret currently is a Mississippi resident.[4]   In 2005 Favret owned a majority interest in F & F, a Louisiana limited liability company, which in turn owned a 50% membership interest in Venezia Resort, LLC ("Venezia Resort"), a Mississippi limited liability company.  During the time relevant to this action, Venezia Resort was developing for sale 338 residential resort condominium units on property it owned in Biloxi, Mississippi.  Favret was the managing member of F & F and Venezia Resort.  Favret was involved with all aspects of Venezia Resort's operations but he primarily dealt with the company's financing and loan matters.   Dave Clark ("Clark") and William Wulfers ("Wulfers") were the assistant managers of Venezia Resort and primarily were engaged in sales and project development matters  for the venture.[5]  Venezia Resort also had eight or nine other members who were passive investors only; of these persons all but two resided in Florida.

Beginning in approximately June 2005 Venezia Resort maintained an office in Gulf Breeze, Florida, out of which Clark and Wulfers worked.[6]  Sales and design/development activities (such as those involving architectural, engineering, marketing/advertising and

---

[3]  See doc. 1 (complaint) and doc. 45 (evidentiary hearing transcript).  See also doc. 34 (clerk's minutes, with reference to Plaintiff's Exhibits 1-7 and Defendants' Exhibits 1-3).

[4]  Favret has been a Mississippi resident since January 2006.  Prior to that time he was a resident of Louisiana.  At no time relevant to this action has Favret resided in Florida.

[5]   Favret, Clark, and Wulfers conceived the Venezia Resort project sometime around November 2004.  Favret apparently first organized the project, known as the Cabana Bay Beach Resort, LLC, in December 2004.  The name of the company was changed to Venezia Resort, LLC, in February 2005.

[6]  At least one other enterprise, a brokerage firm for Venezia Resort sales, also operated from the Gulf Breeze office.

legal services) for the condominium project were conducted at or from the Gulf Breeze office.[7]  Bookkeeping and other records were also kept there.  One office worker was employed at the Gulf Breeze office, and Venezia Resort's toll-free telephone number could be answered there.  Favret maintained a separate office in Louisiana,[8] where he conducted some payroll,  checkwriting, and bookkeeping activities for Venezia Resort, as well as some tax accounting activities.  He also conducted business activities at his Louisiana office for F & F and other companies which he owned.[9]

Venezia Resort held operating and escrow accounts in a bank located in Biloxi, Mississippi, beginning around April 2005 and continuing at least through December 2006. The address shown on many of the bank statements is on Lameuse Street in Biloxi, the address of Venezia Resort's Mississippi attorney and registered agent, Pat Sheehan.[10] Escrow and operating accounts were also maintained with a Pensacola, Florida, bank beginning sometime around November 2005.  Favret, Clark, and Wulfers had signature authority on all Venezia Resort operating accounts, as well as the Pensacola escrow account.[11] Favret attended at least one re-finance closing in Florida related to the Venezia Resort project, and he was present at approximately twenty Venezia Resort membership or operations meetings in Florida.  He also attended other meetings by telephone from his

---

[7] Favret resided in Louisiana but Clark and Wulfers resided in the greater Pensacola area.  The Gulf Breeze location was selected due to its proximity to the homes of Clark and Wulfers.

[8] Favret in fact worked out of several different locations in Louisiana during this time, apparently due to having been displaced from his office in New Orleans after Hurricane Katrina struck in August 2005.

[9] Favret's other business interests whose activities were conducted from his Louisiana office included B & A Development, LLC, and Biloxi Boardwalk, LLC.

[10] Venezia Resort's operating agreement also shows this address as its principal place of business. Venezia Amos contends that this address was correct only at the time the company was initially organized as Cabana Bay Resort, although it concedes the address was never officially changed.  Two statements reflect addresses for Favret's Louisiana offices in New Orleans and later Metairie, Louisiana.  Venezia Amos also notes that the operating agreement provides that the company may conduct business any place or places as the managers may determine, which in this instance was Gulf Breeze, Florida.  Clark testified that no Venezia Resort business was ever conducted from the Lameuse Street location.

[11] Clark suggested that the three also had signature authority over an escrow account maintained by Sheehan but Favret disputed this.

office in Louisiana.  At least after the initial organization of Venezia Resort, no corporate meetings were held in Louisiana and no membership or sales meetings were ever conducted there.  Also, neither Clark nor Wulfers ever used Favret's Louisiana office to conduct Venezia Resort business.

In approximately mid-August 2005, from his office in Louisiana, Favret wrote or faxed a letter to Clark addressed to the Venezia Office in Gulf Breeze.  The letter memorialized verbal statements Favret had made to Clark previously indicating that he was interested in offering for sale a 40% share of F & F for $5,000,000.[12]  In the letter Favret explained that because F & F owned a 50% interest in Venezia Resort, the 40% stake in F & F would result in the purchaser's ownership of a 20% share of Venezia Resort.  Favret projected a cash flow to the Venezia Resort members of $63,500,000, meaning that the purchaser of the F & F interest would receive $12,700,000, or – after the purchase price – a return of $7,700,000 over thirty-six months.  According to Favret, this would amount to a 51.33 percent annualized return.  Favret also stated in the letter that he would guarantee at least a "40% lookback" of this amount.  Clark advised Favret that he might know of an interested buyer for the 40% interest of F & F, and he contacted Amos in this regard on Favret's behalf.  Clark sent a copy of Favret's letter to Amos, though Favret testified that the letter was a private communication between Clark and himself that he did not anticipate would be used directly to solicit a buyer or to negotiate terms.[13]

Sometime in late August or early September of 2005 Amos and Favret, along with Clark and Wulfers, met at a hotel for dinner on Pensacola Beach, where Amos and Favret discussed the sale of the F & F stake.  Favret was aware that Amos knew of the purchase terms Favret had described in his letter to Clark.  Amos testified that during this meeting he and Favret reached agreement regarding the general terms of the deal, conditioned on his receipt of acceptable written financial information from Favret.  According to Favret, however, the discussions remained preliminary in nature only and no agreement was

---

[12]  Doc. 1, Exh. A.

[13]  Favret nevertheless acknowledged that he sent the letter to Clark hoping that Clark would locate a buyer for the 40% interest in F & F.

reached.  Some time after the dinner meeting – a day or two as recalled by Amos and Clark or a month or so as recalled by Favret – Amos attended a members' meeting of Venezia Resorts at an attorney's office in Pensacola; Favret also attended.  Amos was introduced by Clark as a potential investor in Venezia Resort through an ownership interest in F & F.  During the members' meeting Amos and the other members were given pro forma materials for Venezia Resorts – which were prepared by Favret, Clark, Wulfers, and his son Jason Wulfers (who sold Venezia Resort units for the company) – that outlined the anticipated return on the project.

According to Favret, he and Amos did not have the opportunity to talk about the sale of the 40% interest of F & F during the members' meeting but Amos recalled that the two further discussed the venture briefly.  Amos and Favret agree, however, that after the members' meeting they continued to communicate regarding the stake in F & F that Favret was offering for sale.  The discussions were conducted via telephone, letter, and e-mail from their resident states or elsewhere outside of Florida.  In an October 3, 2005, letter sent by fax from Louisiana to Georgia, Favret provided Amos with a schedule of expected developer fee payments for Venezia Resort based on its latest pro forma report.[14]  Favret also stated in the letter that he would personally guarantee the "40% lookback" return, which he described as being "solid" because he would be "significantly liquid" and also would agree to defer his last payment of profit through F & F until Venezia Amos had reached the threshold amount promised under the agreement.

By the end of October 2005 Amos and Favret had finalized the terms of the sale of the 40% interest in F & F to Venezia Amos.  On October 25, 2005, Favret, individually and for F & F, executed a guaranty and memorandum of understanding.[15]  Additionally, Favret

---

[14]  Doc. 1, Exh. B.

[15]  Doc. 1, Exh. D.  Under the guaranty, F & F agreed to pay Venezia Amos "a guaranteed return of forty percent (40%), but in no event no less than the return of five million dollars ($5,000,000.00) together with a return on said investment in the amount of forty percent (40%) per annum through the date of repayment."  The guaranty further provided that Favret "Individually, guarantees collection and payment to Venezia Amos, L.L.C., it successors and assigns, the return as greed to by F & F Developers, L.L.C."  Favret also agreed to "defer the final distribution of profits due to Ben Favret, paid to F & F Developers, L.L.C., as distribution by Venezia Resort, L.L.C., until such time as Venezia Amos, L.L.C. receives the threshold amount of the

(and in some instances, Favret's sister, who was a F & F minority interest member)[16] executed an amendment to operating agreement of F & F (also signed by Amos), an assignment of interest, consent to transfer of interest and admission to membership.[17]  The documents were executed independently by the parties in their individual resident states, Amos' attorneys in Georgia and Florida having previously finalized or reviewed the instruments on Amos' behalf.  On November 3, 2005, Venezia Amos transmitted by wire the $5,000,000 purchase price to Favret to a bank in Louisiana.[18]

On June 20, 2006, Amos sent Favret an e-mail asking him to confirm that as of that date the amount to be paid to Venezia Amos under their agreement was $6,340,000; by return e-mail the same date Favret agreed that the amount was correct.  In July 20, 2006, Venezia Resort asked Amos to advance additional funds in order to cover outstanding interest due on a loan related to the property.  After seeking and receiving updated an updated pro forma report and other financial information from Favret, Amos advanced an additional $100,000 to Venezia Resort.  In August 2006 the Venezia Resort members voted to remove Favret as managing member.  The State of Mississippi terminated the charter of Venezia Resort, LLC, sometime during the fourth quarter of 2006.  This was also the last time any business was conducted for Venezia Resort from the Gulf Breeze office.

Venezia Amos filed the instant action in April 2007.[19]  In its complaint plaintiff alleges that federal question and diversity jurisdiction lie pursuant to 28 U.S.C. §§ 1331 and 1332,

---

Guaranteed Return described hereinabove."  In support of the guaranty, Favret provided a balance sheet dated July 31, 2005, which showed that Favret's personal net worth was $26,784,200.

[16]  Sometime in 2005 Clark became a 2.5% interest owner in F & F. Also, according to Clark, F & F presently owns a 30% interest in Venezia Resort.

[17]  Doc. 1, Exhs. F and C.

[18]  Amos acknowledged that, under the terms of the guarantee, when payment to him was due he expected that it would be sent to him in Georgia.

[19]  A related case, originally filed as an interpleader action, was removed to this court on February 14, 2007.  See Venezia Resort, LLC, v. Favret, et al., 3:07cv74/MCR.  The related action has been stayed based on considerations articulated in Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L.Ed.2d 483 (1976) (authorizing federal district court to stay action when there is ongoing parallel action in state court)) that have not been raised in this case.

respectively, and that supplemental jurisdiction over the state law claim exists pursuant to 28 U.S.C. § 1367. After reciting certain factual allegations, Venezia Amos asserts that the balance sheets with which it was presented did not "accurately reflect the financial condition of the Defendant, Favret"; that " the pro forma information presented to Amos by Favret was inaccurate and inflated as to expected profit returns"; that "Favret used his position . . . with Venezia Resort to present Amos misleading pro forma information as being an accurate representation of the expected financial return for the condominium project"; that "Favret knew at the time the balance sheet was presented to the Plaintiff that it did not accurately reflect Defendant Favret's financial position"; and that "Defendant's actions were deliberate and intended to deceive, manipulate and/or defraud Plaintiff." Plaintiff also alleges that the accuracy of the balance sheet, financial statements, and pro forma information were material to Venezia Amos' purchase of the 40% interest in F & F and that Favret knew that Venezia Amos relied on such accuracy.[20] Based on its factual and other assertions, plaintiff alleges that defendants (1) breached the parties' guarantee and amended operating agreement; (2) violated §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("SEA"); and (3) made fraudulent misrepresentations in order to induce Venezia Amos to purchase a 40% membership interest in F & F. As relief, plaintiff seeks compensatory and punitive damages as well as attorney's fees and costs.

## MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

In its complaint Venezia Amos does not specify under which section of Florida's long-arm statute jurisdiction is conferred. In response to defendant's motion to dismiss, however, plaintiff argues that personal jurisdiction is appropriate under both § 48.193(1)(a) and § 48.193(2) of the Florida Statutes. For the reasons given below the court concludes, based on a preponderance of the evidence, that Favret and F & F are subject to both specific and general jurisdiction in Florida.[21]

---

[20]  See doc. 1 at 6.

[21]  See Lane v. Capital Acquisitions and Management Co., 2006 WL 4590705 (S.D.Fla. 2006) (citing United States Sec. & Exch. Comm'n v. Carrillo, 115 F.3d 1540, 1542 (11th Cir. 1997) and indicating that where an evidentiary hearing has been held the plaintiff must prove the existence of personal jurisdiction by a preponderance of the evidence); see also Francosteel Corp. v. MV. Charm, 19 F.3d 624, 626-27 (11th Cir.

Legal Standard

A federal district court sitting in diversity "may exercise personal jurisdiction to the extent authorized by the law of the state in which it sits and to the extent allowed under the Constitution." Meier ex rel. Meier v. Sun Intern. Hotels, Ltd., 288 F.3d 1264, 1269 (11th Cir. 2002).  Thus, in deciding whether it may exercise jurisdiction over a nonresident defendant, a federal district court in Florida must first "determine whether the Florida long-arm statute provides a basis for personal jurisdiction. If so, then [it] must determine whether sufficient minimum contacts exist between the defendants and the forum state so as to satisfy 'traditional notions of fair play and substantial justice under the Due Process Clause of the Fourteenth Amendment.'"   Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 626 (11th Cir. 1996) (citing Robinson v. Giarmarco & Bill, P.C., 74 F3d 253, 256 (11th 1996)); SEC v. Carrillo, 115 F.3d 1540, 1542 (11th Cir. 1997).

Florida's long-arm statute authorizes courts to exercise specific jurisdiction pursuant to Fla. Sta. §48.193(1) and general jurisdiction pursuant to Fla. Sta. §48.193(2). Madara v. Hall, 916 F.2d 1510, 1516 n. 7 (11th Cir. 1990).  A court may exercise specific jurisdiction over a nonresident defendant only when the plaintiff's cause of action arises from or is directly related to a defendant's contacts with the forum state. Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino, 447 F.3d 1357, 1360 n. 3 (11th Cir. 2006) (citing Consolidated Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1292 (11th Cir. 2000)). Specific jurisdiction requires some "direct affiliation, nexus, or substantial connection between the cause of action and the [defendant's] activities within the state."[22] Sun Trust Bank v. Sun Int'l Hotels, Ltd., 184 F.Supp.2d 1246, 1269 (S.D.Fla. 2001) (quoting Citicorp Ins. Brokers (Marine) Ltd. v. J.R. Charman, 635 So.2d 79, 81 (Fla. 1st DCA 1994)) (internal quotation marks omitted).  Where a defendant's business activities are concerned, specific jurisdiction will attach provided the defendant is carrying on a business or business

---

1994).

[22]  This requirement is often referred to as "connexity." Sun Trust Bank v. Sun Int'l Hotels, Ltd., 184 F.Supp.2d 1246, 1270 (S.D.Fla. 2001) (citing Bloom v. A.H. Pond Co., Inc., 519 F.Supp. 1162, 1168 (S.D.Fla.1981)).

venture in Florida either itself or through an agent. See § 48.193(1)(a).[23]  In such instances the defendant's activities "considered collectively . . . [must] show a general course of business activity in the state for pecuniary benefit."  Sculpchair, 94 F.3d at 627 (citing Dinsmore v. Martin Blumenthal Assocs. Inc., 314 So.2d 561, 564 (Fla. 1975)).

A court may exercise general jurisdiction pursuant to § 48.193(2) when the suit does not arise out of the nonresident's contacts with Florida provided the nonresident is engaged in substantial and not isolated activity in the state.[24]  Stubbs, 447 F.3d at 1360 n. 3 (citing Meier, 288 F.3d at 1269); see Fla. Sta.  § 48.193(2).  Florida courts have interpreted "substantial and not isolated activity" to mean "continuous and systematic general business contact." Autonation, Inc. v. Whitlock, 276 F.Supp.2d 1258, 1262 (S.D.Fla. 2003) (citing Woods v. Nova Cos. Belize Ltd., 739 So.2d 617, 620 (Fla. 4th DCA 1999)).  These contacts must show a "general course of business activity in the State for pecuniary benefit." Stubbs, 447 F.3d at 1361 (citations and internal quotation marks omitted).  Although this is similar to the contact requirement for carrying on a business or business venture under §48.193(1)(a), for general jurisdiction to attach a defendant's business contacts with the forum "must be especially pervasive and substantial . . . ." General Cigar Holdings, Inc. v. Altadis, S.A., 205 F.Supp.2d 1335, 1343 (S.D.Fla. 2002).

Once the court has determined that jurisdiction over a nonresident defendants exists under the long-arm statute, it has to then decide whether it can exercise that jurisdiction under the Constitution.  This inquiry, which is primarily concerned with matters of due process, asks first whether the defendant has sufficient minimum contacts with the state such that he should reasonably anticipate being sued there, Achievers Unlimited, Inc. v. Nutri Herb, Inc., 710 So. 2d 716, 719 (Fla. 4th DCA 1998), and second, whether it is fair to require the defendant to defend the suit in the forum state. See Posner v. Essex Ins. Co.,

---

[23]  Section 48.193(1)(a) provides that jurisdiction over a nonresident exists if the nonresident has "operated, conducted, engaged in, or carried on a business or business venture in this state or has an office or agency in this state . . . ." Fla. Stat. § 48.193(1)(a).

[24]  Section 48.193(2) provides that jurisdiction over a nonresident exists if the nonresident has "engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." Fla. Stat. § 48.193(2).

Ltd., 178 F.3d 1209, 1221 (11th Cir. 1999) (citing Int'l Shoe v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)).  The minimum contacts requirement is satisfied if the defendant "purposefully directs activities at Florida and litigation arises out of those activities, or the defendant purposefully avails himself of the privilege of conducting activities within the forum state."[25] Achievers Unlimited, Inc., 710 So. 2d at 719.  In determining whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice, the court should consider such matters as the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies. See Meier, 288 F.3d at 1276.

Discussion

Plaintiff does not advance an agency theory with respect to the relationship between Favret and F & F but the court nonetheless concludes that the theory is applicable in this case.  A corporation or company may be subject to jurisdiction when it transacts business through its agents in the forum state, unless the agents are only transacting business on their own account. Sculptchair, 94 F.3d at 628.  "The elements of an agency relationship under Florida law are (1) acknowledg[ ]ment by the principal that the agent will act for it, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." State v. Am. Tobacco Co., 707 So.2d 851, 854 (Fla. 4th DCA 1998).  An agency relationship does not exist unless the principal has a right to control the operative details of the agent's work. Stoll v. Noel, 694 So.2d 701, 703 (Fla. 1997).  The evidence in this case supports a finding that F & F acknowledged that Favret would act for it in matters

_____

[25]   The "continuous and systematic" contacts requirement for general jurisdiction is so demanding that if the defendant's activities meet the statutory requirements of § 48.193(2), the minimum contacts due process standard is also satisfied.  Woods, 739 So.2d at 620.  Accordingly, a court need not conduct a separate minimum contacts analysis for purposes of general jurisdiction.

concerning Venezia Resort and that Favret accepted such duties.[26]  As to the issue of control, there is no question but that F & F possessed (and exercised) the right to control the operative details of Favret's work involving Venezia Resort – through Favret himself as F & F's majority interest member.  The court therefore finds that Favret served as the agent of F & F in connection with Venezia Resort business.

The evidence is undisputed that Favret was the managing member of Venezia Resort and that Venezia Resort maintained an office in Florida where extensive company business was conducted.  The evidence also reflects that Favret attended a re-finance closing in Florida related to the Venezia Resort development and held signatory authority over two Venezia Resort bank accounts in Florida, at least as of November 2005. Moreover, and most notably, Favret attended approximately twenty Venezia Resort membership or operations meetings in Florida between the time of the company's initiation in February 2005 and its termination during the last quarter of 2006.  Nothing in the record contradicts the reasonable conclusion that Favret attended the membership and operations meetings in his individual capacity as the majority interest owner of F & F, as the agent of F & F, and as the managing member of Venezia Resort.

Some of the meetings and banking activities may have taken place after Venezia Amos purchased the interest in F & F in October 2005.  Even so, the court believes that the evidence of Favret's activities in Florida prior to October 2005 supports a finding of specific jurisdiction.  Favret, in his individual capacity, and F & F, as represented by Favret, engaged in business activities in Florida having a substantial connection to plaintiff's claims arising from its purchase of an equity interest in F & F.  As noted, Favret traveled to Florida to meet with Amos in order to discuss the sale of the 40% stake in F & F, which Venezia Amos desired to purchase for the sole purpose of obtaining, through that stake, an interest in Venezia Resort.  Moreover, on numerous other occasions Favret traveled to Florida for operations and members' meetings; indeed, all but two of the eight or nine Venezia Resort

---

[26]  Indeed, Section 5.1 of F & F's operating agreement states "General Management.  Except as otherwise expressly provided herein, the management and control of the day-to-day operations of the L.L.C. and the maintenance of the property of the L.L.C. shall rest exclusively with [Favret] as Managing Member."

members were Florida residents.  Favret also took a major role in developing the Venezia Resort project, particularly with respect to financing and loan matters and, presumably, had been involved in locating the Florida investors.  The court is persuaded that the evidence of Favret's conduct, wherein he acted for himself individually and for F & F, is sufficient to demonstrate a general course of business activity in the state for pecuniary benefit that has a "direct affiliation, nexus, or substantial connection" with plaintiff's claims regarding his investment of $5,000,000 in F & F in order to obtain an interest in Venezia Resort.  Sun Trust Bank, 184 F.Supp. at 1269.  Accordingly, the court finds that specific personal jurisdiction pursuant to § 48.193(1)(a) exists in this case over Favret and F & F.  The court further finds, based upon the evidence previously discussed, that Favret and F & F, through its agent Favret, had sufficient contacts with Florida such that they purposely availed themselves of the privilege of conducting activities within Florida and should reasonably have anticipated being haled into court in this state.  Achievers Unlimited, Inc., 710 So. 2d at 719.

Even absent a finding that  § 48.193(1)(a) provides a basis for specific jurisdiction, the court concludes that general jurisdiction attaches pursuant to § 48.193(2).  Favret held signatory authority on two Florida bank accounts and – in his individual capacity, as F & F's agent, and as the managing member of Venezia Resort – he attended some twenty Venezia Resort meetings. Additionally, Favret served as the managing member of Venezia Resort, whose principal office and majority of financial backers were located in Florida. Favret's contacts were sufficiently "continuous" and "systematic" to be considered substantial and not isolated business activity.  Stubbs, 447 F.3d at 1360 n. 3.  The contacts show a general course of business activity in Florida for pecuniary benefit by Favret and F & F that was pervasive and substantial enough to satisfy the more rigorous standard required for general jurisdiction. The court thus finds that Favret and F & F are subject to general jurisdiction pursuant to § 48.193(2), and consequently, that their activities satisfy the minimum contacts due process standard.  Woods, 739 So.2d at 620.

The court also finds that its exercise of jurisdiction does not offend traditional notions of fair play and substantial justice.  Favret and F & F may, it is true, be burdened to some

extent by having to defend in this foreign forum.  The burden appears to be minimal, however, especially given modern means of transportation and communication.  Moreover, on numerous prior occasions Favret has demonstrated the ability to travel the approximately three hours generally needed to drive from the New Orleans area to the Pensacola area in order to conduct the business activities previously outlined.  Also, Florida has an interest in adjudicating a dispute between F & F and Venezia Amos that has implications for Venezia Resort and thus its members, the majority of whom are Florida residents.

For all of foregoing reasons, the court concludes that it has personal jurisdiction over Favret and F & F in this case.  Defendants' Rule 12(b)(2) motion is therefore denied.

## MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

### Count II: Violation of  §§ 10(b) and 20(a) of the Security and Exchange Act

Count II of the complaint alleges the violation of §§ 10(b) and 20(a) of the SEA. Defendants move for dismissal of this count, first arguing that it fails to state a claim for relief because plaintiff's interest in F & F is not a security within the meaning of the SEA.

The Securities Exchange Act of 1934 defines the term "security" as including the catch-all term "investment contracts." 15 U.S.C. § 78c(a)(10). Although the phrase "investment contract" is not defined in the statute, the Supreme Court has enunciated a flexible three-pronged test for determining whether a particular transaction qualifies as an "investment contract."  Securities & Exchange Commission v. W.J. Howey Co., 328 U.S. 293, 298-99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946) (noting that the investment contract definition "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.").  As explained in Howey, "[a]n investment contract for the purposes of the Securities Act means a contract, transaction, or scheme whereby a person (1) invests his money in (2) a common enterprise and is led to (3) expect profits solely from the efforts of the promoter or a third party." Id.  In Securities & Exchange Commission v. Edwards, 540 U.S. 389, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004), the Supreme Court reaffirmed the Howey definition, reiterating that "'Congress'

purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.' To that end, it enacted a broad definition of 'security,' sufficient 'to encompass virtually any instrument that might be sold as an investment.'" Id. at 393 (quoting Reves v. Ernst & Young, 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990)).

In the instant case, the parties agree that the test set forth in Howey is properly applied here to determine whether plaintiff's membership interest in F & F is a security. There appears to be no dispute with respect to whether plaintiff has met the first two parts of the  Howey test  – the record is clear that Venezia Amos invested $5,000,000 in order to obtain a 40% interest in F & F, a common enterprise.  The parties' dispute centers around the third element.[27]  Defendants argue that because F & F is a member-managed limited liability company, plaintiff's interest in F & F lacks the passivity required to show the expectation of profit to be derived from the entrepreneurial efforts of a third party.[28]  Plaintiff responds that indeed Venezia Amos is a passive member of F & F, having bought its interest solely for the purpose of investing in Venezia Resort.  Moreover, plaintiff argues that F & F cannot be described as "member-managed" given the numerous provisions in the operating agreement which effectively provide for centralized management by the managing member, Favret.

Plaintiff's arguments, particularly regarding whether  F & F is centrally-managed by Favret instead of member-managed, are well-taken.  In addition to providing that the day-to-day management and control of F & F rests only with Favret, the operating agreement also states that only Favret, as the managing member, has the authority to bind, act, or

---

[27]  The parties also apparently do not disagree with respect to that part of the third element that refers to the expectation of profit by the investor.  In any event, this requirement is satisfied because the amended operating agreement specifically states that plaintiff shall "receive no less than a 40% per annum return" on its contribution.

[28]  According to defendants, under its organizational structure each member of F & F is  entitled to cast one vote for each percentage of the company it owes, the right to inspect, etc., the company's records and accounts, and distributable cashflow, income, gain, losses, deductions, and credits to be made in accordance with the membership percentage interest.

assume any obligation or responsibility for F & F.[29]  Moreover, the agreement permits the managing member to carry out the purposes of the company and enumerates the managing member's many exclusive powers.  The managing member also has the authority, under the operating agreement, to establish bank accounts for the company and designate those who may withdraw funds from the accounts.[30]  The agreement also calls for the managing member – at his own discretion – to distribute capital assets.[31]  Even assuming that Venezia Amos has voting rights and may inspect the company's records, as defendants argue, the court is persuaded that any expectation of profits by F & F members arises strictly from the efforts of its managing member, Favret.

For these reasons the court concludes that plaintiff has satisfied all three elements of the Howey test.  Accordingly, it finds that Venezia Amos' membership interest in F & F constitutes an "investment contract" and thus is a security within the meaning of the SEA.

Next, defendants contend that Count II fails to meet the pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 78u-4(b).  According to defendants, plaintiff's allegations regarding the violation of §§ 10(b) and 20(a) lack the specificity demanded by Fed.R.Civ.P. 9(b), which requires that fraud be alleged with particularity, and the PSLRA, which requires that scienter be pled with particularity.  Defendants contend that plaintiff's allegations at most complain of a lack of accuracy.  According to defendants, the allegations fail to identify adequately defendants'

---

[29]  The court notes that the amended operating agreement was attached to plaintiff's complaint but the initial operating agreement itself was not; defendants supplied it as an attachment to Favret's affidavit. (Doc. 16).

It is true that the court generally must convert a Rule 12 motion to dismiss into a Rule 56 motion for summary judgment if it considers materials outside of or not attached to the complaint, Day v. Taylor, 400 F.3d 1272, 1275-76 (11th Cir. 2005), and that under most circumstances such materials would not be part of the record for a Rule 12(b)(6) ruling. Harris v. Ivax Corp., 182 F.3d 799, 802 n. 2 (11th Cir. 1999). The Eleventh Circuit recognizes an exception to this requirement, however, in cases in which a plaintiff refers to a document in the complaint, the document is central to the plaintiff's claims, the document's contents are not in dispute, and the defendant attaches the document to its motion to dismiss. Id. In this case, notwithstanding that plaintiff's reference in its complaint is to the amendment to the operating agreement rather than to the original itself – a deviation which the court does not consider fatal – all of these requirements are met in this case. In connection with the Rule 12(b)(6) motion, therefore, the court has considered the operating agreement.

[30]  Plaintiff notes that he has not been given authority to withdraw funds from F & F's accounts.

[31]  See Sections 1.4, 1.5, 5.1, 5.2, and 7.5 of F & F's operating agreement.  Doc. 16, attachment.

allegedly false or misleading statements and financial documents, and they fail to specify in what ways the statements and documents were false or misleading.  Defendants also maintain that the complaint does not allege facts to support plaintiff's conclusory assertion that defendants' actions were deliberate and committed with the intent to defraud.  Plaintiff responds that its allegations are adequate to avoid dismissal because it has stated with sufficient specificity that Favret knowingly made material misrepresentations in the pro forma materials and balance sheets he provided, which plaintiff relied upon in deciding to purchase an interest in F & F.

In order to state a claim under section 10(b) and rule 10b-5, a plaintiff must allege 1) a material misrepresentation or omission; 2) scienter; 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) a causal connection between the material misrepresentation and the loss.  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); see also Ziemba v. Cascade Intern., Inc., 256 F.3d 1194, 1202 (11th Cir. 2001). On a motion to dismiss, the court must accept as true all well-pleaded allegations of the complaint and construe all reasonable inferences therein in the light most favorable to the plaintiff. Ziemba v. Cascade Int'l, Inc., 256 F .3d 1194, 1198 n. 2 (11th Cir. 2001) (citing Byrant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n. 1 (11th Cir. 1999)).  Ordinarily, under the Rule 12(b)(6) standard, dismissal may be avoided if the complaint's "[f]actual allegations [are] enough to raise a right to relief above the speculative level . . . "; in other words, [if] the complaint [ ] include[s] "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550____U.S. ____, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007).  In order to survive a motion to dismiss in a securities fraud claim, however, a plaintiff must satisfy Rule 9(b), which requires that the circumstances constituting fraud be stated with particularity. In re: Recoton Corp. Sec. Litig., 358 F.Supp.2d 1130, 1138 (M.D.Fla. 2005). This particularity requirement is satisfied when the complaint sets forth "(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what

the defendants obtained as a consequence of the fraud." Id. (quoting Ziemba, 256 F.3d at 1202). The Eleventh Circuit has noted that the scienter requirement is satisfied by a showing that the defendant had "an intent to deceive manipulate or defraud" or that the defendant "acted with a severely reckless state of mind." Bryant, 187 F.3d at 1282-83. The PSLRA further heightens the pleading burden because it requires that the complaint also contain factual specificity as to the alleged misleading or omitted statements and the particular facts that raise a strong inference that a defendant acted with the required state of mind. Under the PSLRA, failure to meet either of these provisions mandates dismissal of the claim. See § 78u-4(b)(1)(2); 78y-4(b)(3)(A).

In addition to pleading fraud with particularity and scienter sufficiently, the plaintiff must also show that the misrepresentations alleged "caused the loss for which plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  "[L]oss causation describes 'the link between the defendant's misconduct and the plaintiff's economic loss.'" Robbins v. Koger Properties, Inc., 116 F.3d 1441, 1447 (11th Cir. 1997) (quotation omitted). A plaintiff ultimately proves loss causation by showing "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." Id. (citation and internal quotation omitted). Allegations of artificial price inflation alone do not satisfy the loss causation requirement. Id . at 1448.

The court concludes that the allegations in the complaint are sufficient with respect to identifying what documents or oral representations were made and the time and place of each such statement and the person responsible for making them.  Where the complaint's allegations falter is with respect to the content of the statements and the manner in which they misled plaintiff.  Plaintiff repeatedly characterizes the statements and written documents provided by defendants as being simply "inaccurate"; moreover, it does not provide sufficiently detailed allegations with respect to how these "inaccurate" statements misled it into purchasing the interest in F & F.  Additionally, although the complaint alleges that the defendants knew its statements and documents were inaccurate and that they acted with the intent to deceive, manipulate, or defraud plaintiff, it does not allege particular facts that strongly raise the inference of such intent.  Nor are the

allegations specific with respect to what the defendants obtained as a consequence of the alleged fraud; the complaint does not adequately identify the loss that plaintiff allegedly suffered nor the basis of the causal relationship, i.e., how defendants' asserted misrepresentations in fact caused plaintiff's loss.

For these reasons, the court concludes that plaintiff's allegations in Count II are insufficient under the applicable heightened pleading standards to state a claim of violation of  §§ 10(b) of the SEA.  Plaintiff also asserts liability pursuant to  § 20(a) of the SEA.  In order to plead control liability adequately under this provision, a plaintiff must first state a claim for a primary violation of § 10(b).  See 15 U.S.C. § 78t.  Because the complaint fails to state a claim for primary liability under § 10(b), the court finds that any claim for control person liability is also due to be dismissed.  With respect to Count II, therefore, defendants' motion pursuant to Rule 12(b)(6) is granted.

### Count III: Fraudulent Misrepresentation

Count III of the complaint is plaintiff's state law claim for fraudulent misrepresentation.  Under Florida law, the elements of fraudulent misrepresentation are "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation." Webb v. Kirkland, 899 So.2d 344 (Fla. 4th DCA 2005) (citation omitted).

The complaint contains numerous references regarding the "inaccurate" information provided by Favret but it fails to allege that statements or representations were *false* or that Favret made such false statements or representations knowingly.  The complaint also fails to allege the injury suffered by plaintiff in acting on reliance on the representation.  For these reasons, the court concludes that plaintiff's allegations fail to allege "enough facts to state a claim to relief [fraudulent misrepresentation] that is plausible on its face." Twombly, 127 S.Ct. at 1964-65.  Defendants' Rule 12(b)(6) motion to dismiss Count III is therefore granted.

For the foregoing reasons, defendants' motion to dismiss for lack of personal jurisdiction is denied and its motion to dismiss Counts II and III for failure to state a claim

is granted.  As a final matter, the court addresses plaintiff's request that it be allowed an opportunity amend its complaint if the court should find merit in defendants' arguments for dismissal pursuant to Rule 12(b)(6).  The Federal Rules of Civil Procedure allow a party to amend its pleadings "once as a matter of course . . . before being served with a responsive pleading . . . ." Fed.R.Civ.P. 15(a)(1)(A).[32]  No answer or other responsive pleading has yet been filed in this case, and plaintiff has not previously amended.[33]  Plaintiff therefore has the right to file an amended complaint as a matter of course.  Such amended complaint shall be filed within fourteen (14) days of the date of this order.  As provided in Rule 15(a)(3), defendants shall plead in response within ten (10) days after service of the amended complaint.

Accordingly, it is ORDERED:

1.     Defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction (doc. 10) is DENIED.

2.     Defendants' motion to dismiss Counts II and III of the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim (doc. 10) is GRANTED.

3.     Dismissal of Counts II and III is without prejudice to plaintiff's filing an amended complaint within fourteen (14) days of the date of this order.

4.     An initial scheduling order shall be entered separately.

DONE and ORDERED this 12th day of February, 2008.

s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

---

[32]  According to the Note to Fed.R.Civ.P. 15, 2007 Amendment, Rule 15 was amended effective December 1, 2007, as part of the "general restyling of the civil rules to make them more easily understood." The change to Rule 15 is "intended to by stylistic only."

[33]  For purposes of Rule 15(a), a motion to dismiss is not a responsive pleading. Williams v. Board of Regents of the Univ. Sys. of Georgia, 477 F.3d 1282, 1291 (11th Cir.  2007).